UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SHANNON LINDER,

    Plaintiff,

  v.                                                             Case No. 23-CV-1051-SCD

MARTIN J. O'MALLEY,
  *Commissioner of the Social Security Administration*,

    Defendant.

---

## DECISION AND ORDER

---

    Shannon Linder applied for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* After the Social Security Administration denied Linder's application, she filed this action seeking judicial review of the Commissioner's decision. For the reasons that follow, I will affirm the denial of disability benefits.

## BACKGROUND

    Linder applied for social security benefits in 2021, initially claiming that she became disabled in 2010 and later amending the onset date to May 8, 2021. R. 64, 212. The state agency charged with reviewing the applications on behalf of the Social Security Administration denied Linder's claim initially and upon her request for reconsideration. R. 119, 141.

    After the state agency denial, Linder appeared with counsel for a hearing before an ALJ. R. 60–91. Linder testified that she lives with her mother and grandmother and that she supports herself with child support from her ex-husband, although her daughter now lives with her ex-husband. R. 66, 68. Linder does not go out often but spends her time doing chores

and will also read up to five books per day, depending on her mood. R. 68–69. She cooks, cleans, does laundry, and has helped care for her mother and grandmother. R. 80–81. Linder will not do anything on the days she experiences depression, which she estimated occurs an average of one to three days per month. R. 69. She also testified about exhibiting emotional outbursts of angry yelling when depressed, R. 71–72, and being incapacitated by migraine headaches two to three days per month, R. 79. Linder has a high school education and last attempted to work as a deli clerk in early 2021 but recounted that the hours and concentration were too much while she was caring for her daughter and battling depression. R. 70.

Melissa Hennessy testified at the hearing as a vocational expert. R. 82–90. Linder did not have any past work to consider, but Hennessy advised that a hypothetical person with Linder's vocational profile could perform jobs existing in the national economy, such as office helper, marker, and mail clerk. R. 84–86.

In March 2023, the ALJ issued a written decision denying Linder's disability application. R. 26–28. He considered the application under 20 C.F.R. § 416.920(a), which sets forth a five-step process for evaluating SSI claims. See R. 30–53. At step one, the ALJ found that Linder had not engaged in substantial gainful activity since her alleged onset date. R. 31. At step two, the ALJ determined that Linder had the following severe impairments: degenerative disc disease, migraines, depressive disorder, anxiety disorder, attention deficit hyperactivity disorder, post-traumatic stress disorder, personality disorder, and substance use disorder (alcohol). R. 31. At step three, the ALJ found that Linder did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. R. 32. Then, the ALJ determined Linder's residual functional capacity (RFC)—

that is, the most she could do despite her physical and mental limitations, *see* 20 C.F.R. § 416.945(a). In this regard, the ALJ concluded that Linder could:

> perform light work as defined in 20 CFR 416.967(b) except she can never climb ladders, ropes, or scaffolds. She must avoid all use of dangerous moving machinery. She must avoid all exposure to unprotected heights. She must avoid concentrated exposure to noise above moderate noise intensity [i.e., noise not greater than the Selected Characteristics of Occupations (S.C.O.) coding of 3, moderate e.g., department store or grocery store]. She is able to work in an environment with light intensity no greater than what is found in a typical office setting. She is limited to understanding, remembering and carrying out no more than simple instructions. She is limited to simple, routine tasks. She is limited to employment having only occasional decision making required, and only occasional changes in the work setting. She is limited to work where there is no production rate or pace work such as an assembly line with no specific hourly production quotas; variably paced tasks and end of the day production quotas are permissible. She can tolerate only occasional superficial (that is, work related) interaction with the public. She can tolerate only superficial interactions with co-workers and supervisors.

R. 40.

Ultimately, the ALJ determined at step five that there were jobs existing in significant numbers in the national economy that Linder could perform. R. 52–53. Based on the step-five finding, the ALJ determined that Linder was not disabled at any time since she applied for benefits. R. 53. The Social Security Administration's Appeals Council subsequently denied Linder's request for review, R. 1, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In August 2023, Linder filed this action seeking judicial review of the Commissioner's decision denying her claims for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 7, 8. Linder filed a brief in support of her disability claim, ECF No. 12; the

3

Commissioner filed a brief in support of the ALJ's decision, ECF No. 19; and Linder filed a reply brief, ECF No. 20.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Linder alleges three errors in the ALJ's decision: (1) substantial evidence does not support the ALJ's rejection of Linder's personal statements about her symptoms and related limitations; (2) substantial evidence does not support the ALJ's conclusion that Linder's medical source opinions were "unpersuasive"; and (3) the RFC does not adequately account for Linder's "moderate" limitations with maintaining concentration, persistence, and pace. ECF No. 12 at 3. The Commissioner maintains that the ALJ's decision is supported by substantial evidence and should be affirmed. ECF No. 19 at 2–3.

### I. Claimant's Subjective Allegations

Linder argues that the ALJ lacked substantial evidence to conclude that her symptomatic descriptions are inconsistent with the record. ECF No. 12 at 4–15. The Commissioner responds that the ALJ reasonably evaluated the evidence in this case and assessed an RFC supported by substantial evidence. ECF No. 19 at 10.

Linder suggests that the ALJ must not understand bipolar disorder because his decision ignored her bipolar diagnosis and did not find it to be a severe impairment. ECF No. 12 at 5–6. But Linder ignores that federal regulations direct an ALJ not to rely on diagnoses to establish impairments. *See* 20 C.F.R. § 416.921 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)."). Rather, the relevant federal regulation states that "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." *Id.* The ALJ did not mention bipolar disorder at step two of the sequential analysis, but he found that Linder had depressive disorder, among several other severe impairments. *See* R. 31. Therefore, the ALJ determined at step three whether Linder met or medically

equaled the severity of this impairment, which social security regulations categorize under "Depressive, bipolar and related disorders." *See* R. 37; *see also* 20 C.F.R., pt. 404, subpt. P, app. 1 § 12.04.

Nevertheless, Linder contends that the ALJ's failure to explicitly consider bipolar disorder as a severe impairment supports an inference that the ALJ did not properly evaluate the condition. ECF No. 20 at 1. I simply cannot make that leap, especially given that bipolar disorder is evaluated under the same criteria as depressive disorder. *See* 20 C.F.R., pt. 404, subpt. P, app. 1 §§ 12.00(B)(3), 12.04. Linder does not identify what harm came from triggering the § 12.04 analysis from a finding of depressive disorder, nor does she contend that she satisfies the § 12.04 criteria. She merely suggests that the lack of explicit consideration of bipolar disorder as a possibly severe impairment must have infected the ALJ's subsequent evaluation of her symptoms and limitations. *See* ECF No. 20 at 1–2. But a diagnosis alone does not demonstrate the severity of an individual's symptoms. *See Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (noting that equating a diagnosis with actual functional limitations requires "leap of logic"); *McGillem v. Kijakazi*, No. 20-2912, 2022 WL 385175, at *4 (7th Cir. Feb. 8, 2022) ("[T]he need for restrictions cannot be inferred from the diagnosis alone"). Linder does not explain how the alleged infection manifested itself, other than arguing that the ALJ improperly rejected Linder's statements concerning the limiting effects of her variable functioning. ECF No. 12 at 6.

In this regard, Linder contends that the ALJ failed to build the required "accurate and logical bridge" between her symptomatic statements and his rejection. *See id.* From Linder's perspective, the ALJ's explanation relied on three treatment notes from December 2022, as well as his opinion that Linder's activities of daily living are "not as limited as one might

6

expect." *Id.* at 6. This summary grossly mischaracterizes the ALJ's decision. After determining that Linder has medically determinable impairments that could reasonably be expected to cause her alleged symptoms, the ALJ announced that Linder's "statements concerning the intensity, persistence and limiting effects of these symptoms cannot reasonably be accepted as sufficiently consistent with the medical evidence and other evidence in the record." R. 41. The ALJ proceeded to evaluate Linder's medical and other evidence over the next four pages, before repeating the same conclusion about Linder's statements being insufficiently consistent with the record. *See* R. 41–45. It is at this second juncture—in a paragraph opening with "Overall"—that the ALJ also repeats his observations about the December 2022 treatment notes. *See* R. 45–46. Therefore, the logical inference is that the ALJ relied on the overall evidence described in the preceding paragraphs and merely highlighted the December 2022 treatment notes as emblematic examples.

Similarly, the ALJ devotes the next two paragraphs to Linder's activities of daily living, carefully synthesizing what the activities suggest about Linder's capacity rather than equating the activities with an ability to perform full-time work. R. 46. For example, the ALJ observed that Linder uses a cell phone for social media and reading books and that she reads up to five books per day, "showing good capacity for using digital technology to interact with others, and for concentrating and understanding when reading." R. 46. The ALJ also observed that certain activities demonstrate Linder's capacity to interact with others, use digital technology, and to understand, remember, and concentrate. R. 46. Linder questions the reasonableness of the ALJ's logic, but I will not accept her invitation to reweigh the evidence or substitute my judgement for that of the ALJ here. *See* ECF No. 20 at 5. While reasonable minds may differ

7

about the degree of capacity Linder's activities demonstrate, I find the ALJ's conclusions about Linder's daily activities are sturdy enough to support the accurate and logical bridge.

Linder further argues that the ALJ erred by failing to explain *why* he credited evidence that showed Linder was doing well over her statements concerning the limiting effects of her variable functioning. ECF No. 12 at 9. She suggests the ALJ failed to "even acknowledge the contrary evidence or to explain the rationale for crediting the identified evidence over the contrary evidence." *Id.* (quoting *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). To the contrary, the ALJ explicitly acknowledged that Linder's symptoms may vary over time and that her provider diagnosed her with "unspecified bipolar and related disorder." *See* R. 35, 42, 46. The ALJ also recognized multiple occasions on which Linder presented with subnormal functioning, such as:

- 2021 treatment notes reflecting "that the claimant often presented with other symptoms such as being distractible and irritable, with agitated motor activity, pressured speech, and poor judgement/impulse control," R. 42;

- Linder's hospitalization for a reported suicide attempt in November 2021, R. 42;

- Treatment from November to December 2021 reflecting "symptoms of anger, feelings of hopelessness, fatigue, irritability, detachment, feelings of anxiety, with depressed, mood, anhedonia, difficulty sleeping, fatigue, poor concentration, and crying spells," R. 42;

- December 2021 reports of "flashbacks, hypervigilance, and avoidance . . . noted to have displayed unstable relationships, impulsive behavior, suicidal gestures, and splitting," R. 42;

- Treatment notes from 2022 indicating "that the claimant's mood had recently been exacerbated by stressors, but was now back at baseline during treatment, R. 43; and

- June 2022 records reflecting "periodic symptoms of flashbacks, hypervigilance, and avoidance consistent with P.T.S.D., with the claimant also reporting memory limitations." R. 43.

8

At the same time, the ALJ observed a myriad of objective evidence tending to suggest that Linder was not as limited as alleged. For example, the ALJ cited:

- May 2021 notes reflecting that Linder was "doing well from a psychiatric standpoint," with her mood and anxiety "for the most part well controlled," R. 41;

- July 2021 report to be "overall doing well" with "unremarkable" mental findings, R. 41–42;

- June to September 2021 records indicating Linder had "intact" functional status, R. 42.;

- November 2021 treatment notes reflecting anxiety and tearfulness while discussing suicide attempt but otherwise "unremarkable" findings, R. 42;

- In-patient mental health treatment from November to December 2021, being discharged as "stable" and "able to perform her activities of daily living independently," R. 42;

- December 2021 report that medication had improved Linder's energy and sleep; she felt better and had unremarkable mental status other than being anxious, R. 43;

- Treatment notes from 2021–22 revealing that Linder was "cooperative, pleasant, friendly, with intact memory, fair to normal judgment, fair insight, and with good concentration," R. 43;

- November 2022 records that Linder was "clinically stable" on medication; denied panic attacks, mania, suicidal ideation, and paranoia; and was exhibiting good mood, linear and goal-directed thought process, fair insight/judgment, and alert and oriented cognition, R. 43;

- December 2022 report that Linder was doing "great" overall[1] and was noted to be exhibiting "normal" functioning with work, self-care, sleep, and socialization with others, R. 44.

---

[1] Linder takes issue with the fact that she reported being great overall to a pharmacist during a phone call following up from a medication change. ECF No. 12 at 10; *see also* R. 1083. But the nature of the report does not change its contents. In fact, the medication in question (Lamotrigine) is used to treat bipolar disorder, which makes the report more relevant than if the medication pertained to some unrelated or temporary condition. *See, e.g.*, "Lamotrigine," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK470442/ (last accessed Sept. 3, 2024). Linder also protests that the pharmacist's call notes mention her fatigue and daytime naps. But the ALJ cited therapy records that consistently reflect Linder's normal functioning at this time. *See* R. 44 (citing R. 933).

Regardless of the symptom recognition, the Commissioner contends that Linder failed to explain what further restrictions her variable functioning would even necessitate. ECF No. 19 at 11. In that respect, Linder suggested that she would miss work too much because she testified that she has "bad days" where she is depressed and will just stay in bed and not go anywhere one to three times per month. *See* ECF No. 12 at 14–15 (citing R. 69). Linder also noted that, when depressed, she will become irritable and angry over little things, sometimes causing her to lash out or yell, and that difficulties with concentration and difficulties understanding instructions affected her ability to perform her last job. *Id.* at 15 (citing R. 70–71). Linder emphasizes that the VE testified that similar deficits would be work preclusive, such as one to two absences per month, needing two to three unscheduled breaks per week, being "off task" more than ten percent of the workday, needing an unusual level of supervision, or interacting with an angry voice or yelling on at least occasions. *Id.* at 15 n.5 (citing R. 87–89). However, I find Linder's argument is a veiled attempt to reweigh the evidence. *See Freeman v. Astrue*, 816 F. Supp. 2d 611, 615 (E.D. Wis. 2011) ("This court cannot reweigh evidence or substitute its judgment for that of the ALJ.").

Ultimately, the ALJ did not ignore Linder's statements about her limitations and variable functioning or reject them in their entirety. *See* R. 41–45. The ALJ's decision reflects that he considered the variability Linder alleges and concluded that her claimed limitations simply did not match up with the fullest capacity demonstrated by the objective medical evidence. *See id.* After all, the RFC reflects the "most" a claimant can do despite her limitations, and the ALJ relied on the objective medical evidence, which is a "useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related

10

activities . . . ." Social Security Ruling 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1020935, at *14168 (Mar. 16, 2016). Linder has not shown that the ALJ's evaluation of her subjective allegations was patently wrong. *See Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024) (noting that reviewing courts "will overturn the ALJ's evaluation of a claimant's subjective symptoms only if it is 'patently wrong, which means that the decision lacks any explanation or support'") (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). On this record, I find that Linder has failed to demonstrate reversible error and that substantial evidence supports the ALJ's evaluation of her statements concerning the limiting effects of her variable functioning.

## II. Persuasiveness of Medical Source Opinions

Linder argues that the ALJ's conclusion that her medical source opinions are unpersuasive is not supported by substantial evidence. ECF No. 12 at 15. She challenges the ALJ's treatment of three opinions: (1) the January 2022 questionnaire co-signed by providers Amber Bartholf, M.S., and Annie Mallmann, Psy.D., R. 726–30; (2) the February 2022 questionnaire co-signed by providers Matthew Fiorillo and Kathryn Krieg, M.D., R. 731–35; and (3) the November 2022 questionnaire signed by provider Samantha Olson, L.M.P.T.-S.A.C., R. 1076–80. The Commissioner maintains that the ALJ properly applied the regulations governing the evaluation of opinion evidence and that Linder is merely asking me to reweigh the evidence. ECF No. 19 at 13–14.

While these three opinions were authored by treating providers, the old treating source rule that defaulted to deferential treatment does not apply to Linder's case. The new regulation, found at 20 C.F.R. § 416.920c(a), specifies that an ALJ is to evaluate all medical opinions for persuasiveness through a checklist of factors. Of these factors, the ALJ is only

11

required to explain how he considered the two deemed most important: supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2). "Supportability is measured based upon 'how much the objective medical evidence and supporting explanations presented by a medical source support the opinion.'" *Marcelina R. v. O'Malley*, No. 23-CV-181, 2024 WL 3581742, at *4 (N.D. Ill. July 30, 2024) (citation omitted). "Consistency assesses how a medical opinion squares with other evidence in the record." *Id.*

Linder essentially argues that the ALJ misjudged the supportability and consistency of the three medical opinions. As Linder recognizes, the ALJ deemed the opinions unpersuasive for largely the same reasons: (1) the assessments contain limited explanatory statements; (2) the assessments do not indicate when Linder's limitations began; (3) the opinions are inconsistent with non-examining state agency doctor opinions, and (4) November and December 2022 treatment notes reflected normal mental status and Linder reported she was "doing great." R. 49–51. The ALJ also acknowledged that the opinions were similar to each other but opined that their "overall weaknesses" resulted in such consistencies "not making the opinions any more persuasive than they would be singly." R. 50–51.

Linder proffers various pieces of evidence that allegedly support each doctor's opinion, but I find her aim is merely to reweigh the evidence. *See* ECF No. 12 at 17–19. She suggests the ALJ cherry-picked evidence to support his conclusion and failed to dig behind the checkbox opinions for record support. *See id.* On the contrary, I find the ALJ demonstrated a balanced and thorough grasp of the record, evidenced in part by the extensive evaluation addressed in the previous section regarding the consistency of Linder's statements with the objective record. Moreover, this is not a case where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d

12

936, 940 (7th Cir. 2002). Therefore, the ALJ was not required to repeat himself. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (finding the ALJ's discussion of the claimant's impairments, objective medical evidence, and credibility elsewhere in the decision provided "the necessary detail to review the ALJ's step 3 determination in a meaningful way" and that "[t]o require the ALJ to repeat such a discussion throughout his decision would be redundant").

Ultimately, Linder's attempt to mince the ALJ's reasoning is ineffective. She is correct that the ALJ needed to consider the supportability of the opinions based on the record as a whole, but that does not diminish the ALJ's observation that the providers failed to provide much detail to support the serious limitations opined on the assessments. R. 50–51. More importantly, the ALJ's supportability analysis did not stop there. Rather than repeat the summary already crafted, the ALJ's mention of the November and December 2022 treatment notes provides some emblematic examples underpinning his conclusion that the providers' opinions conflicted with the medical record. R. 50–51. The ALJ also remarked that the opinions failed to specify when the limitations began, which goes to show that the ALJ questioned which contemporaneous records to review in the record for supportability beyond those available at the time of the evaluations themselves. R. 50–51. Finally, Linder overemphasizes the ALJ's reliance on the state agency consultants. She argues that the ALJ could not solely rely on the opinion of a non-examining physician to reject an examining doctor's assessment. ECF No. 12 at 19 (citing *Samuel v. Barnhart*, 295 F. Supp. 2d 926, 952 (E.D. Wis. 2003)). But, under the new regulatory approach, the Seventh Circuit has held that an ALJ may credit a non-examiner over an examiner "upon a finding that the former was more consistent with and supportable by the record." *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th

13

Cir. 2022). For these reasons, I find Linder has failed to establish error in the ALJ's assessment of her medical source opinions.

### III. Concentration, Persistence, and Pace

Linder argues that the RFC does not adequately account for her deficits in maintaining concentration, persistence, and pace (CPP). ECF No. 12 at 19. The ALJ concluded that Linder had a moderate limitation in CPP and assessed several related restrictions, such as being able to understand, remember, and carry out no more than simple instructions; limited to simple and routine tasks; occasional decision-making and changes; no production rate pace work and no specific hourly production quotas; and can only tolerate occasional, superficial interaction with the public and only superficial interactions with supervisors and coworkers. R. 38, 40, 52.

Linder contends that courts have found these assigned limitations inadequately accounted for other claimants' moderate CPP limitations. ECF No. 12 at 20. But, while that information may be helpful, it has no direct bearing on whether these limitations are adequate for Linder. As Linder recognizes, "[t]he law does not require ALJs to use certain words, or refrain from using others," but "the ALJ must account for the totality of a claimant's limitations in determining the proper RFC." *Martin*, 950 F.3d at 374. The Seventh Circuit recognizes "that a restriction to simple tasks is 'generally' not enough to account for moderate CPP limitations. . . . The concern is that the restriction is used as a one-size-fits-all solution without delving into an individualized assessment of the claimant's specific symptoms." *Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020).

Here, Linder argues that her treating medical providers reported that her CPP deficits would result in time off task, need for an unusual level of supervision, and a need for

14

unscheduled work breaks. ECF No. 12 at 21. But Linder over-emphasizes the ALJ's moderate CPP finding. A "moderate" limitation does not mean that a claimant should be assigned every possible limitation related to this category, nor will it result in the same CPP limitations for every claimant. In fact, "moderate" simply means that Linder's functioning in that domain "independently, appropriately, effectively, and on a sustained basis [was] fair." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2)(c). "'[F]air' in ordinary usage does not mean 'bad' or 'inadequate.'" *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021); *see also Green v. Kijakazi*, No. 21-C-678, 2022 WL 1644936, at *18 (E.D. Wis. May 23, 2022) ("[A]n ALJ's finding of a 'moderate' CPP limitation at step three does not necessarily mean he is required to include any particular limitation(s) in the RFC, much less find the claimant disabled."). So, a moderate limitation does not always result in a corresponding limitation that must be incorporated into the RFC assessment.

As discussed above, the ALJ found the opinions of Linder's treating providers unpersuasive. R. 49–51. Those three assessments each checked boxes for twenty to twenty-five percent of time off task during a typical workday. R. 727, 732, 1077. Regarding the need for unscheduled breaks, providers Bartholf and Mallmann checked that Linder would need two to three per day. R. 727. They offered no written explanation but checked the boxes for panic/anxiety and fatigue as the symptoms that would necessitate such breaks. R. 727. The opinion from providers Fiorillo and Krieg was the same but also checked symptom boxes for crying and intrusive thoughts. R. 732. Provider Olson's report similarly noted that Linder would need two to three unscheduled breaks per day, but she wrote in the explanation that it was due to "difficulties with staying on task" and checked boxes for intrusive thoughts, panic/anxiety, fatigue, and need to isolate. R. 1077. Finally, these providers noted a varying

15

need for extra supervision: providers Bartholf and Mallmann did not check a box at all and wrote "usual level of supervision with additional redirection as needed", R. 728; providers Fiorillo and Krieg checked that Linder would need extra supervision three or more times per week, R. 733; and provider Olson appeared to scribble out a check next to one to two times per day and wrote "N/A" in the explanation line, R. 1078.

Overall, I find the discrepancies with respect to the need for extra supervision undermine Linder's argument for additional CPP limitations. She has not shown that her "fair" ability to maintain concentration, persistence, or pace precluded her from performing work within the parameters of the ALJ's mental RFC. Linder has effectively asked me to replace the ALJ's judgment with that of my own. I find, however, that substantial evidence supports the ALJ's RFC with respect to Linder's CPP limitations.

## CONCLUSION

For all the foregoing reasons, I find that substantial evidence supports the ALJ's decision and that Linder has not demonstrated that the ALJ committed reversible error in denying her disability claim. I therefore **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 9th day of September, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge